1  facing a certain 25-year-to-life sentence if convicted of passing some bad checks.[15/]   Under such

2  circumstances, a "very large" defendant with an extremely violent past clearly poses a security

3  concern.

4       Contrary to what Rameses may suggest, clearly established United States Supreme Court

5  precedent does not limit the use of restraints to cases in which "there has also been evidence of

6  disruptive courtroom behavior, attempts to escape from custody, assaults or attempted assaults in

7  custody, or a pattern of defiant behavior toward corrections officials and judicial authorities." P&As

8  at 8 (citing *Duckett*, 67 F.3d at 749 [which in turn cites to other Ninth Circuit cases]).  As the high

9  court noted, a trial court's exercise of discretion in ordering restraints must be case specific–i.e., "it

10  should reflect particular concerns, say special security needs or escape risks, related to the defendant

11  on trial." *Diaz*, 125 S.Ct. at 2015.

12       Given the combination of factors for the trial court's concern for courtroom security in this

13  case, and the fact that existing case law at the time suggested that use of a stun belt was the least

14  restrictive and least prejudicial form of restraint, Respondent submits that the trial court did not

15  abuse its discretion in ordering Rameses to wear a stun belt during trial.  The state court's rejection

16  of Rameses' stun belt claim was not an unreasonable application of United States Supreme Court

17  precedent.

18  **B.   Any Error In Requiring Rameses To Wear A Stun Belt In Trial Was Harmless**

19       In *Gonzales*, the Ninth Circuit recognized that "[e]xcept in certain circumstances, to find

20  relief on collateral review, a federal habeas petitioner must show that the error resulted in actual

21  prejudice." *Gonzales*, 341 F.3d at 903.  In the habeas context, where a petitioner's constitutional

22  rights are allegedly violated from the use of restraints at trial, "the petitioner must show that the

23

24  _____

25       15.  Rameses made numerous filings that resulted in delay of his trial, including motions to dismiss for interference with right to counsel (I CT 41-48), for change of venue (I CT 49-59), to

26  strike prior convictions based on inadequate advisement before a plea (I CT 60-74), to dismiss or limit evidence pursuant to the Fifth Amendment (I CT 253-76), for discovery of personnel records

27  of a law enforcement officer (I CT 277-296).  There were hearings on Rameses' various motions. I CT 184-86, 251-52; II CT 323-325, 328-41, 349; *see* IX RT 3486-87 (court opined that Rameses'

28  attorneys had engaged in gamesmanship).

1   physical restraints 'had substantial and injurious effect or influence in determining the jury's

2   verdict.'" *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619); *accord*, *Castillo v. Stainer*, 983 F.2d

3   145, 148 (9th Cir. 1992), *amended by* 997 F.2d 669 (9th Cir. 1993). Rameses does not come close

4   to meeting his burden of demonstrating prejudice.

5          The declaration that Rameses provided to this Court, dated October 3, 2005,[16/] was

6   obviously not before the California Supreme Court when that court denied Rameses' state habeas

7   petition on August 10, 2005. Thus, it is not appropriately before this Court unless Rameses can

8   demonstrate that he was not at fault for failing to present it in state court, or unless Rameses can

9   make the showing required under 28 U.S.C. § 2254(e)(2). *Cooper-Smith v. Palmateer*, 397 F.3d

10  1236, 1241-42 (9th Cir. 2005); *see Holland v. Jackson*, 542 U.S. 649, 652 (2004) (holding that

11  federal court erred when it found the state court's application of law unreasonable "on the basis of

12  evidence not properly before the state court") Rameses has not made such a showing, nor is he

13  reasonably able to do so. Rameses is not relying on any new case or statutory law that was created

14  since his filing of his state habeas petition. And Rameses cannot reasonably assert that he exercised

15  due diligence in attempting to present that evidence in state court; the information reflected in his

16  declaration was certainly known to him when he filed his state habeas petition, and nothing

17  prevented him from filing such a declaration with the state court.

18

---

19       16. Respondent notes that in his declaration Rameses asserts for the first time that wearing
20  a stun belt prevented him from testifying on his own behalf. P&As Attachment at 3. That claim was
    never made before the state court. *See* Lodged Item 14 at 24-29. In any event, the record reflects
21  that "[Rameses] state[d] on the record that he is satisfied with the witnesses called to testify on his
    behalf; and after consulting with his attorney, it is his decision not to take the witness stand." II CT
22  497; IX RT 3355. Thus, according to Rameses himself, his decision not to take the stand was
    unrelated to his having to wear a stun belt.
23       Rameses decision not to take the witness stand is not too surprising given that Rameses could
24  have been impeached with his prior felony convictions. (*People v. Greenberger*, 58 Cal.App.4th
    298, 361 (1997) [murder is a crime of moral turpitude and thus evidence of murder may be used to
25  impeach a witness's testimony]; *People v. Johnson*, 233 Cal.App.3d 425, 599 (1991)[no doubt that
    murder conviction reflects "readiness to do evil" that defines moral turpitude]). 3199-3203, 3224-27
26  It is also possible that Rameses could have faced questions about being given the nickname of
27  "Lying Bob," (Lodged Item 32; II CT 337; *see also* V RT 1261, 1265, 1284-85) which would have
    been detrimental to Rameses' defense that he had no intent to defraud when he wrote checks on a
28  closed account in this case (*see* IX RT 3391-3402).

Answer to Petition for Writ of Habeas Corpus

1    But even assuming that Rameses declaration is properly before this Court, it is not enough

2 to show that his wearing of a stun belt "had substantial and injurious effect or influence in

3 determining the jury's verdict."[17/] The trial court clearly indicated that the stun belt was not visible

4 to the jury when Rameses closed his coat.  VIII RT 2986-87.  There is no indication that Rameses

5 ignored the court's advice to hold his coat together when standing before the jury, and there is

6 absolutely no evidence that any of the jurors saw the stun belt.  In fact, recent declarations by two

7 court bailiffs and Rameses' trial attorney show that the jury had not been aware of the stun belt.  *See*

8 Declaration of Dean Irwin (Attachment 1) (Rameses had worn the stun belt underneath his clothes);

9 Declaration of Michael Koring (Attachment 2) (same); Declaration of Lori London (Attachment 3)

10 (attesting that to her knowledge, no member of the jury was aware that Rameses wore a stun belt at

11 trial).  *Williams v. Woodford*, 384 F.3d 567, 592-93 (9th Cir. 2004) (when jury never saw the

12 defendant's shackles, the shackles did not prejudice the defendant's right to a fair trial).

13    As to Rameses' claim that wearing the belt also "impeded his ability to follow the

14 proceedings and take an active interest in the presentation of his case" (P&As at 10), it should be

15 noted that his own declaration defeats the claim.  Rameses cites one instance in which he was

16 allegedly prevented from pointing out to his attorney a misstatement by the arresting officer as to the

17 offense for which he was arrested.  He questioned why his attorney did not cross-examine the

18 witness on that error or any of the other errors in his testimony.  P&As Attachment at 2-3.  Rameses

19 also stated that there were "many other occasions during trial when I wanted to inform  Ms. London

20 [defense counsel] about factual misstatements of witnesses or suggest a line of questioning, but did

21 not do so because I was intimidated by the stun belt."  P&As Attachment 3.  Obviously, if Rameses

22 was sufficiently aware of all the alleged mistakes in witnesses' testimonies and had ideas for lines

23 of questioning, he was paying close attention to the trial proceedings.

24    As to Rameses claim that wearing the stun belt interfered with his communications with

25 counsel during trial, the record renders that unsubstantiated claim highly suspect.  From the first day

26

27

28    17.  Rameses himself notes the record reflects that a prosecutor had described him as a "pathological liar."  P&As at 22; RT 1162-63.

1   of trial, the trial judge emphasized to Rameses the importance of participating in his own defense

2   and in communicating with his attorney. The trial judge stated:

3         . . . So now it's your obligation, Mr. Rameses, to speak through Miss London. If
        there's anything you want me to know, anything you want the jury to know, be sure and
4       communicate with her. She is your life-line here. She is your one chance to walk out
        these doors.

5

6         I want to impress upon you, it's vital that you cooperate 100 percent fully with her.
        Give her any information, any thoughts that you have throughout the case. And she's a
        very competent attorney. She will do a good job for you. But it takes your cooperation,
7       your input, and your participation. So keep that foremost in you mind. Okay?

8   VIII RT 2987-88.

9         The main thing is your life's at stake here, Mr. Rameses. And I have a duty to make
        sure it's protected and you have due process here. But you have to do your part. And you
10      can't expect her to do the best job for you unless you give her that information.

11  VIII RT 2995.

12        The record shows that Rameses heeded the court's advice. He was not shy about speaking

13  up in court. After the court explained why it had ordered him to wear a stun belt, Rameses asked

14  the trial court to make an express ruling that it was making that order over Rameses' objection and

15  without an evidentiary hearing. VIII RT 2988-89. Thereafter Rameses launched into a complaint

16  about being denied the right to counsel of his choice and the right to defend himself, and about the

17  fact that his attorney had not spent sufficient time discussing the case with him or getting from him

18  a list of prospective defense witnesses. VIII RT 2989-96. The record reflects that Rameses had no

19  qualms expressing what he wanted his attorney to do or in communicating directly with the court.

20  *See also* VIII RT 3001-04; IX 3453, 3455-60; III CT 623-24. Rameses was even granted permission

21  to represent himself following the jury trial. II CT 575; IX RT 3461-82.

22        Rameses filed a pro per motion for new trial (II CT 576-79; III CT 782-96; IX RT 3504-

23  05). In that motion, Rameses recognized that a new trial may be granted on any grounds that caused

24  the denial of a fair trial and provided information in a narrative explaining why he was entitled to

25  one. II CT 582-86. Notably, Rameses never once even mentioned having to wear a stun belt, let

26  alone that his defense was prejudiced by it. *Id.* Nor did Rameses raise the issue in his direct appeal

27  or in his first state habeas petition. *See* Lodged Items 1, 2, 4 and 12. From his filings in the trial

28  court and the court's responses, Rameses was well aware that his right to communicate with counsel

Answer to Petition for Writ of Habeas Corpus

1  could not be violated. I CT 41-48 (motion to dismiss for interference with right to counsel; III CT

2  623-25 (motion regarding access to legal runners and attorneys); *see also* III CT 655. If the wearing

3  of a stun belt prejudiced Rameses' ability to communicate with his attorney or to fully participate

4  in his own defense at trial, it is certainly remarkable that he would have waited more than five years

5  after his conviction to raise that claim. Thus, there is ample reason to reject Rameses' claim of

6  prejudice based on the trial record alone.

7        And of course, Rameses' claim of impediment is rendered even more incredible by the

8  recent declarations included herein. The two court bailiffs that had held the remote control to

9  Rameses' stun belt deny warning Rameses against speaking to anyone in court. Attachments 1 &

10  2. One bailiff denied any knowledge of an alleged incident in which Rameses asked to speak with

11  his attorney and was told to sit down and shut up (Attachment 2) while another declared that "[n]one

12  of the bailiffs would tell a prisoner to 'sit down and shut up' if they wanted to speak with their

13  attorney (Attachment 1). More importantly, Rameses' trial attorney declared that Rameses never

14  indicated to her that his ability to communicate with her or to participate in his own defense was

15  hampered by having to wear the stun belt. Attachment 3. She did not believe that Rameses was

16  impeded in any way by the stun belt. *See id.*

17        Moreover, even assuming there was some impediment, Rameses does not offer any

18  concrete evidence to show prejudice. He merely alleges that his communications with counsel and

19  his participation in his own defense were hindered by use of the stun belt and asks this Court to

20  presume that increased communications with counsel or Rameses' increased participation in trial

21  would have affected the outcome of the trial. Essentially, his claim is akin to a claim of ineffective

22  assistance of counsel for failure to adequately investigate wherein the petitioner fails to specify what

23  additional evidence would have been disclosed had additional investigation been done and how that

24  additional evidence would have impacted on the jury's decision. In such cases, the Ninth Circuit has

25  found that the petitioner failed to meet his burden of demonstrating prejudice. *E.g.*, *James v. Borg*,

26  24 F.3d 20, 26 (9th Cir. 1994) (petitioner did not identify what evidence counsel should have

27  presented so his conclusory allegations of counsel's ineffectiveness was insufficient to warrant

28  relief); *Gallego v. McDaniel*, 124 F.3d 1065, 1077 (9th Cir. 1997) (no showing of prejudice where

Answer to Petition for Writ of Habeas Corpus

1  there was no information as to what further investigation of witness would have produced that might

2  have changed the result of the trial); *Villafuerte v. Stewart*, 111 F.3d 616, 632 (9th Cir. 1997)

3  (petitioner offered no evidence concerning what counsel could have found and therefore failed to

4  show prejudice).  Absent specificity as to how the defense case would have been altered had he not

5  been required to wear a stun belt, Rameses cannot show establish prejudice.

6          Even if the trial court committed error in ordering Rameses to wear a stun belt, Rameses

7  fails to carry his burden of establishing that he was prejudiced under *Brecht*–i.e., that the use of the

8  stun belt "had substantial and injurious effect or influence in determining the jury's verdict."

9                                              **III.**

10  **THE STATE COURT'S DENIAL OF RAMESES' *APPRENDI* CLAIM
     (GROUND ONE) WAS NOT AN UNREASONABLE APPLICATION OF**
11  **UNITED STATES SUPREME COURT PRECEDENT**

12          Rameses contends that the trial court's determination that his four prior convictions in

13  Florida qualified as strikes under California's Three-Strikes Law violated his federal constitutional

14  rights as interpreted in *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  P&As at 10-11.  This claim

15  was presented to the California Supreme Court and rejected on the merits by a silent denial.  Lodged

16  Items 15 and 16; P&As at 13.  Once again, this Court must conduct an independent review to

17  determine if that decision was "objectively unreasonable."  *Himes v. Thompson*, 336 F.3d at 853; *see*

18  *also Luna v. Cambra*, 306 F.3d at 960, *amended* 311 F.3d 928; *Bailey v. Newland*, 263 F.3d at 1028,

19  1033; *Fisher v. Roe*, 263 F.3d at 914, 917; *Delgado*, 233 F.3d at 982.  It was not.

20  **A.    Factual Background**

21          On direct appeal of his conviction in state court, Rameses argued that there was

22  insufficient evidence that his four second-degree murder convictions in Florida were strike priors.

23  Lodged Item 7 at 11.  The state appellate court rejected that argument, stating:[18]

24          The People introduced into evidence the Florida indictments, judgments and plea
         agreement.[19]  [I CT 204-250, 508; IX RT 3439-44.] . . . The plea agreement explicitly

25

26  _____

         18.  Additions to the state appellate court opinion will be included within brackets.
27
         19.  The People's exhibits were admitted into evidence without objection.  II CT 498, 508;
28  IX RT 3430, 3438.

Answer to Petition for Writ of Habeas Corpus

incorporated the indictments by reference, as follows: The written Florida plea agreement provides in part that defendant "shall plead" to specified counts in the indictments [which each charged various first degree murders] "said charge[s] to be reduced to Second Degree Murder" and other charges would be "nolle prossed [not pursued] after sentencing [.]" ... This is not a case where the indictments were "not responsive to the plea" and therefore are unreliable, as defendant asserts. Here, the indictments fleshed out the plea.

Each of the three relevant indictments charged the admitted murders with some particularity, as follows. Indictment No.86-32222 charged (count I) that on October 30, 1986, defendant "as part of a common scheme or plan, and while acting as a principal in concert with [another], did unlawfully and feloniously, form a premeditated design to effect the death of a human being, to wit: RUDOLPH BROUSSARD, kill RUDOLPH BROUSSARD, a human being, by shooting him with a firearm, to wit: A pistol." [I CT 223.] Count II alleges the same as to victim Anthony Brown. [I CT 223-24.] Indictment No. 87-3750 charged that on September 21, 1986, defendant, acting with premeditation or while committing a burglary "did . . . kill and murder CECIL BRANCH, a human being, by stabbing, slashing or cutting the said CECIL BRANCH with a deadly weapon, to wit: A sharp metal object, such as a knife or sword." [I CT 238.] Indictment No. 87-3751 alleged the same as to victim Raymond Kelley, except the weapon was described simply as "A knife." [I CT 248.] Therefore, the indictments served to provide the factual bases of the crimes admitted by defendant's plea.

The plea agreement disposed of other charges and another case (conspiracy to escape) and reduced four first degree murder charges to second degree murder. [I CT 204.] The judgments show defendant was guilty of two second-degree murders "with" a firearm and two second-degree murders "with" deadly weapons ("knife or sword" and "knife"). [I CT 216, 234, 244.] Defendant thus committed four felonies with the use of deadly weapons.

. . . [T]he judgments recite defendant murdered his victims "with" specified weapons. The trial court rationally could infer defendant killed them by using deadly weapons, rather than by displaying them. In the reply brief defendant states in a footnote that in the opening brief he argued "weapon findings in Florida do not necessarily establish personal use," as opposed to vicarious use. Again, there were no "weapon findings in Florida." ... [T]he text of the indictments, quoted above, shows that defendant alone killed the two stabbing victims, negating vicarious use. Although it was alleged that he acted "in concert" with another as to the two shooting victims, the indictment charged that in each of two counts defendant "did unlawfully and feloniously, form a premeditated design to effect the death of a human being, . . . kill . . . a human being, by shooting him with a firearm, to wit: A pistol." This language shows defendant was the triggerman.

Lodged Item 7 at 12-15.

**B.     Analysis**

In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Rameses acknowledges that the *Apprendi* rule is subject to an exception for "the fact of a prior conviction," and that the exception had stemmed from *Almendarez-Torres v. United States*, 523 U.S. 224 (1998). P&As at 18. And Rameses does not dispute that *Almendarez-Torres* remains good law.

1  *See United States v. Ivery*, 427 F.3d 69, 75 (1st Cir. 2005) (*Almendarez-Torres* remains binding law);

2  *United States v. Creek*, 415 F.3d 349, 352-53 (4th Cir 2005) (*Almendarez-Torres* has not been

3  overruled); *United States v. Gonzalez-Ruiz*, 369 F. Supp.2d 1151, 1154-55 (N.D. Cal. 2005) (court

4  is compelled to recognized the precedential authority of *Almendarez-Torres*). He asserts, however,

5  that the prior conviction exception applies only to the legal consequences of a defendant's actions

6  such as whether the action results in a conviction, and does not extend to determinations about the

7  conduct itself. *Id.* at 18-20. His argument is not supported by case law.[20]

8          Given the legal landscape set forth *infra*, adoption of Rameses' position that the

9  *Apprendi/Almendarez-Torres* prior conviction exception does not extend to determinations regarding

10  conduct during the prior conviction constitutes a new rule barred under *Teague*. A "new rule" is one

11  that "imposes a new obligation on the State or the Federal Government" or produces a result "not

12  dictated by precedent at the time defendant's conviction became final." *Caspari v. Bohlen*, 510 U.S.

13  383, 390 (1994); *Teague*, 489 U.S. at 301. This case became final 90 days after the California

14  Supreme Court denied Rameses' petition for review–i.e., on October 28, 2003. *Wixom v.*

15  *Washington*, 264 F.3d 894, 897 (9th Cir. 2001). A new rule may not be announced on collateral

16  review any more than it may be applied. *Penry v. Lynaugh*, 492 U.S. 302, 313 (1989); *see also*

17  *Greenawalt v. Ricketts*, 943 F.2d 1020, 1023 (9th Cir. 1991). Only two exceptions exists–i.e., "if

18  the new rule prohibits 'a certain category of punishment for a class of defendants because of their

19  status or offense,' . . . or [if the new rule] presents a new 'watershed rule[ ] of criminal procedure'

20  _____

21      20. Rameses mistakenly relies on *Dillard v. Roe*, 244 F.3d 758 (9th Cir. 2001), as support
for his claim that the state court's finding that he personally used a firearm or other deadly weapon

22  in the commission of his second degree murders violated *Apprendi*. P&As at 17. In *Dilliard*, the
petitioner challenged the state court's imposition of two five-year prior conviction enhancements

23  under Penal Code 667(a) on a current conviction for a "serious" felony. Dillard argued that his
constitutional rights were violated because the court, rather than a jury, found that he had personally

24  used a firearm in inflicting corporal injury to a cohabitant in his *current* conviction, thus making his

25  *current* conviction a "serious" felony. *Id.* at 770-73. The Ninth Circuit determined that the
additional fact found by the trial judge in that instance was an element that transformed the offense

26  for which Dillard was charged and convicted into a different, more serious offense that exposed him
to greater and additional punishment. *Id.* at 773 n.19 (no reliance on *Apprendi*). *Dillard* clearly

27  differs from this case in that it dealt with findings relating to the defendant's conduct in a present

28  offense. Accordingly, the *prior* conviction exception of *Apprendi* was not implicated.

1   that enhances accuracy and alters our understanding of bedrock procedural elements essential to the

2   fairness of a particular conviction" (*Hayes v. Brown*, 399 F.3d 972, 982 (9th Cir. 2005) (en banc))

3   – and they do not apply in this case.  Rameses' proposed "new rule" clearly does not prohibit a

4   certain category of punishment for a class of defendants.  Nor does it involve a "watershed rule" that

5   should be applied retroactively.  *Cf. United States v. Sanchez-Cervantes*, 282 F.3d 664, 667-71 (9th

6   Cir. 2002) (declining to apply *Apprendi* sentencing standards retroactively).

7           Months before Rameses presented his *Apprendi* argument to the California Supreme Court,

8   the United States Supreme Court, in *Shepard v. United States* — U.S. —, 125 S.Ct. 1254 (2005),

9   addressed what it meant by the "fact of a prior conviction."  *United States v. Thompson*, 421 F.3d

10  278, 281 (4th Cir. 2005); *United States v. Ivery*, 427 F.3d at 75 (*Shepard* addressed the scope of the

11  prior conviction exception).  In *Shepard*, the defendant pleaded guilty to being a felon in possession

12  of a firearm.  The government sought to use the Armed Career Criminal Act (ACCA) to enhance

13  Shepard's sentence based on Shepard's prior burglary convictions, in which he entered guilty pleas.

14  ACCA mandates a 15-year prison sentence for anyone possessing a firearm after three prior

15  convictions for serious drug offenses or violent felonies.  A burglary conviction constitutes a prior

16  violent felony under ACCA if it is burglary of a structure or building, but not if the burglary is of a

17  car or vessel.  Because the  burglary statute of Massachusetts, where Shepard's earlier burglary

18  convictions occurred, includes burglaries of non-structures, the government offered police reports

19  and complaint applications to show that Shepard's burglaries qualified as violent felonies under

20  ACCA.  *Shepard*, 125 S. Ct. at 1257-58.  The United States Supreme Court held that those non-

21  conclusive court documents could not be considered.  *Id.* at 1262.  The high court made it clear,

22  however, that judges could rely on a variety of conclusive court documents when determining the

23  nature of a prior conviction.  *Id.* at 1263; *Thompson*, 421 F.3d at 281.  To determine facts about the

24  prior conviction in which a defendant entered a guilty plea, the sentencing court may review "the

25  terms of the charging document, the terms of a plea agreement or transcript of colloquy between

26  judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to

27  some comparable judicial record of this information."  *Shepard*, 125 S.Ct. at 1263; *Thompson*, at

28

1  282.[21/]

2       Cases that followed *Shepard* confirm that the sentencing court can look beyond whether

3  the defendant in fact had a prior conviction for purposes of increasing a defendant's sentence for

4  recidivism.  In *United States v. Marcussen*, 403 F.3d 982 (8th Cir. 2005), for example, the defendant

5  argued that he was denied his Sixth Amendment right to have the facts of his prior convictions–and

6  the characterization of those convictions as crimes of violence–determined by a jury beyond a

7  reasonable doubt.  *Id.* at 983.  Marcussen argued that "determining whether his prior convictions are

8  'crimes of violence' requires the finding of facts beyond the mere fact of a prior conviction."  *Id.* at

9  984.  In rejecting Marcussen's claim, the Eight Circuit stated, "we previously have rejected the

10  argument that the nature of a prior conviction is to be treated differently from the fact of a prior

11  conviction."  *Id.*  The Eight Circuit added, "*Shepard v. United States* lends further support to the rule

12  that the sentencing court, not a jury, must determine whether  prior convictions qualify as violent

13  felonies. — U.S. —, 125 S.Ct. 1254 . . . (discussing documents that a sentencing court may consider

14  in determining the nature of a prior conviction)."

15       *United States v. Burge*, 407 F.3d 1183 (11th Cir. 2005), which presents facts analogous

16  to those in this case, is particularly instructive.  There, Burge was convicted of possession of a

17  firearm by a felon and sentenced under ACCA based on two prior convictions and one prior juvenile

18  adjudication for burglary.  *Id.* at 1185-86.  In order to determine whether Burges' juvenile offense

19  (burglary under Ala.Code § 13A-7-5)[22/] was committed while he was carrying a firearm and,

20  therefore, whether that adjudication could count as a prior conviction for sentencing under ACCA,

21  the district court considered the juvenile petition and the juvenile judgment.  *Id.* at 1187.  The

22  Eleventh Circuit rejected Burges' argument that the district should have been restricted to the "fact"

---

24     21.  The majority opinion in *Thompson* observed that "seven justices [in *Shepard*] indicated
25  that it is constitutional for a judge to find the facts inherent in a prior convictions in the judicial
records of that conviction."  *Thompson*, 421 F.3d at 282 n.3.

26
27     22.  Under Alabama Code § 13A-7-5(a), a person commits first degree burglary if he
knowingly and unlawfully enters a dwelling with intent to commit a crime and if he or another
28  participant in the crime is (1) armed with explosives or a deadly weapon, (2) causes physical injury
to a non-participant, or (3) uses or threatens the use of a dangerous instrument.  *Id.* at 1187 n.2.

1  of his juvenile adjudication and found that the district court had acted consistently with circuit

2  precedent and *Shepard* when it looked to the juvenile petition and judgment to determine that Burge

3  was adjudicated deliquent for committing first degree burglary *while carrying a firearm.  Id.*

4  Here, the sentencing court had before it the documents that *Shepard* says could be

5  considered in determining the nature of his prior conviction–i.e., the terms of the charging

6  documents, the terms of the plea agreement as well as the judgments themselves.  While not cited

7  in the state appellate court opinion, it should be noted that the trial court had before it the plea

8  colloquy from Rameses' Florida convictions in which Rameses stipulated that the indictments state

9  a prima facie case.[23/]  I CT 130-131.

10  The state court's finding that the evidence showed that "[Rameses ] alone killed the two

11  stabbing victims" and that "[he] was the triggerman" in the shooting murders (Lodged Item 7 at 14-

12  15), is presumed to be correct unless proven otherwise by clear and convincing evidence. *Juan H.*

13  408 F.3d at 1270 (citing 28 U.S.C. § 2254(e)(1)).  Rameses makes no attempt to do so.  And

14  Rameses does not refute that he personally used a gun or other deadly weapon in each of his four

15  Florida murder convictions.  Instead, his argument is that the trial court could not find such personal

16  use unless it went beyond the "fact" of his prior conviction and that was something that is precluded

17  under *Apprendi*.  But as discussed, *Shepard* endorsed the actions of the trial court.

18  If other cases following *Shepard* (e.g., *Marcussen* and *Burge*) can conclude that the prior

19  conviction exception to *Apprendi* allows a trial court to look beyond the mere fact of a prior

20  conviction to determine if a defendant's unlawful conduct qualified the prior conviction for

21  sentencing under recidivism statutes, then it follows that the California Supreme Court's rejection

22  of Rameses' claim could not have been contrary to or un unreasonable application of United States

23  Supreme Court precedent.  Accordingly, Rameses is not entitled to relief on this claim.

24

25

---

26  23.  That exhibit and others were admitted into evidence for the trial court's consideration
    of  Rameses' motion to dismiss priors for alleged violations.  I RT 3; see I CT 60-74.  Since that

27  transcript was also part of the official record of Rameses prior convictions (Cal. Rules of Court, rule
    33), it could also be properly considered by the court in determining whether the prior convictions

28  qualified as strike priors. *People v. Abarca*, 233 Cal.App.3d 1347, 1350 (1991).

1

**IV.**

2

**THE STATE COURT'S DENIAL OF RAMESES' CLAIM OF A FIFTH AMENDMENT VIOLATION BASED ON THE PROSECUTION'S USE OF IMMUNIZED TESTIMONY (GROUND TWO) WAS NOT AN UNREASONABLE APPLICATION OF UNITED STATES SUPREME COURT PRECEDENT**

3

4

5

Rameses contends the prosecution's use of immunized testimony violated Rameses' Fifth

6

Amendment privilege against self-incrimination. P&As at 20-26. His claim fails because (1) there

7

is no clearly established Supreme Court precedent that precludes the nonevidentiary use of

8

immunized statements; and (2) even assuming such nonevidentiary use is prohibited, the state court

9

made factual findings that the prosecution's decisions were based on independent grounds.

10

**A.    Factual Background**

11

In 1988, Rameses faced charges for first degree murder and other offenses in four separate

12

cases in Florida.  He entered into a plea agreement to dispose of all those cases whereby he was to

13

plead guilty to four counts of second degree murder with the understanding that he would be

14

sentenced to no more than 22 years in prison.  I CT 204-05.  Pursuant to the terms of Rameses's

15

written plea agreement, Rameses was to provide testimony about his knowledge of the criminal

16

activities engaged in by Yahweh Ben Yahweh and members or followers of the Yahweh sect and

17

about his own involvement in the homicides charged against him.  I CT 205-08.  For his testimony,

18

Rameses was given use and derivative use immunity, but not transactional immunity.  I CT 210-11.

19

On December 23, 1999, after Rameses had been charged with a felony offense for passing

20

bad checks, Rameses filed a motion to dismissal, arguing in part that his Fifth Amendment right

21

against self-incrimination had been violated because the prosecution's decision to charge him with

22

a felony offense was influenced by the immunized testimony that Rameses previously provided in

23

Florida.  I CT 253-263.  A hearing on that motion was conducted on February 1, 2000.  II CT 334.

24

The state appellate court provide the following factual summary for that proceedings:

25

26

27

28

Detective Damien Frisby saw defendant on February 3, because Deputy Yaws [the officer who arrested Rameses on a bad check complaint] had not been able to verify defendant's identity. [IV RT 1020-21.] Eventually defendant told Frisby who he was, that he had been in prison and was in the witness protection program, although he hedged about what he had done.  [IV RT 1023-25.]  Frisby was able to obtain corroborating information and defendant was released.  [IV RT 1030-32.]  The next day or two, Frisby

tried to get information from Florida, and then read Miami Herald articles about defendant from the Internet. [IV RT 1033-37.] He gave these articles to Deputy District Attorney Paul Sutherland; they revealed details from defendant's immunized testimony about the cult and about *seven* murders he committed. [IV RT 1037-39.] Frisby knew defendant had been cited for writing bad checks, and had learned New Jersey authorities were seeking a murder warrant. [IV RT 1054, 1057, 1060-61.] On February 5, Frisby contacted the district attorney, then sought a bail increase. [IV RT 1049-50, 1053-54.] Judge Gregory Haas revoked bail and defendant was rearrested. [IV RT1060, 1063.]

Frisby received more information on February 9. [V RT 1070-71.] Defendant was arraigned that date and Frisby spoke with the press. [V RT 1076.] Beginning on February 11th, more merchants called in to report other checks, having recognized defendant from press reports. [IV RT 1013-20; V RT 1079-86; see V RT 1101-04, 1112-14.] When defendant's house was searched, authorities found collection letters which led to more victims. [V RT 1091-92; see V RT 1114-15.] Frisby did not believe defendant's cult involvement "had anything to do with my decision making process" regarding the investigation; instead, it was defendant's criminal record which concerned him. [V RT 1090-91.] In particular, when he advised filing felony charges, it was not due to the three murders of which defendant was not convicted, but based on the four for which he was convicted, plus the numerosity of the bad checks in this case. [V RT 1093-94.]

Detective Tony Campagna testified that on February 5, New Jersey prosecutors called and wanted to charge defendant with murder and thought he was a flight risk. [V RT 1098-99, 1106.] Campagna asked Judge Haas to increase defendant's bail for these reasons [V RT 1099]; he recommended charging the Three Strikes law because of the amount of losses and the number of bad-check victims, not because of any facts from immunized testimony [V RT 1120-22.]

Sutherland testified he originally prepared the case as a misdemeanor burglary, but wrote it up as a felony bad-check charge after speaking with Frisby and Campagna, when he learned of defendant's criminal history and pending New Jersey warrant; he had also learned about the cult by then. [V RT 1145-50.] By the time he spoke to District Attorney Gary Lacy, he may also have known about defendant having pleaded no contest to a bad-check charge, after which he wrote more checks. [V RT 1153-54, 1158.] Lacy made the final charging decision. [V RT 1151, 1157.] Later, in August, a cult attorney (and apparent member) contacted Sutherland and then sent him transcripts of defendant's immunized trial testimony. [V RT 1258-60, 1268.] Sutherland had used information from those transcripts to increase bail and to oppose a pretrial motion to strike priors. [V RT 1150, 1260, 1278; I CT 95-103.] He wanted to keep defendant in jail pending receipt of the New Jersey warrant, and although via immunized testimony he knew of three murders defendant committed beyond the four of which he stood convicted, "Four murder convictions is way more than enough for our office to pursue three strikes on any defendant" and "as long as I have been in the office, the office has roughly used a $2,000 level" in charging bad-check cases as felonies. [V RT 1146, 1150, 1154, 1178, 1180, 1278.] The total losses here were over $2,000. [V RT 1178.]

Lacy spoke with Frisby and Sutherland and wanted the case charged as a Three Strikes case. [V RT 1295-97.] Lacy's view was that a single murder conviction, even on a bad-check charge, should be filed as a strike. [V RT 1298.] Lacy read articles about dismemberment, but some of the information he read was about the cult in general, rather than defendant's actions in particular. [V RT 1302-04.] He "was going on the fact that these were murder convictions, irrelevant of what the facts were surrounding them, the fact that they were murder convictions, in [his] opinion, warranted the filing of the strikes." [V RT 1308-09.]

1    Although some merchants testified they did not report the bad checks until they saw
2    defendant's picture in the press, the trial court found they did not come forward because
     of any information derived from immunized testimony repeated by the press, but because
     they wanted to recover their losses. [VI RT 1496-98; see also IV RT 1013-20; V RT
3    1079-86, 1101-04, 1112-14, 1116, 1191, 1196, 1203-04, 1225-27, 1231; ].

4    The trial court found neither Frisby nor Campagna were swayed by immunized
     testimony, but instead were acting on the basis of the four murder convictions, the pending
5    New Jersey murder warrant, and the instant bad checks. [VI RT 1499-1502.] The trial
     court found that the prosecutor's view had been fixed independently any immunized
6    information, when "he felt there [were] enough local victims here of the bad check charges
     plus the four murder convictions to warrant the prosecution in this case as a Three Strikes
7    case." [VI RT 1502-03.] The court found Sutherland's use of immunized information at
     the bail hearing was harmless "piling on" because defendant had four murder convictions
8    and a pending murder warrant from New Jersey. [VI RT 1503-04.] Sutherland's effort
     to use the information to oppose defendant's motion to strike the priors was harmless
9    because the trial court had refused to consider that evidence. [VI RT 1502.]

10   The court denied defendant's motion to dismiss based on the Fifth Amendment
     because "of the ample independent source of information wholly independent from any
11   of the tainted information based upon Mr. Rameses's testimony." [VI RT 1504]

12   Lodged Item at 5-9.

13   **B.    Analysis**

14   Under *Kastigar v. United States*, 406 U.S. 441 (1972), a grant of use or derivative use

15   immunity prohibits the use of the compelled testimony and evidence derived therefrom in any

16   subsequent criminal prosecution. *Id.* at 453; *United States v. Crowson*, 828 F.2d 1427, 1428 (1987).

17   An individual who has testified under a grant of use immunity is not, however, shielded
     from all prosecution. [Citation.] "Use immunity does not protect the substance of
18   compelled testimony, it only protects against the use of compulsory testimony as a source
     of evidence." [Citation.] Thus, before trial, the government must show that any evidence
19   it intends to present is derived from a source independent of immunized testimony.
     [Citation.]

20

21   *Crowson*, 828 F.2d at 1428-29; *see also United States v. Velasco*, 953 F.2d 1467, 1473 (7th Cir.

22   1992). While *Kastigar* notes this is a "heavy burden" in practical terms, 406 U.S. at 461, in legal

23   terms, "the government is only required 'to demonstrate by a preponderance of the evidence an

24   independent source for all evidence introduced.'" *United States v. Byrd*, 765 F.2d 1524, 1529 (11th

25   Cir. 1985); *accord, United States v. Montoya*, 45 F.3d 1286, 1292 (9th Cir. 1995) (citing *Crowson*,

26   828 at 1429 [the government must prove the independent source by a preponderance of the evidence

27   and the district court's findings as to that issue will be upheld unless clearly erroneous]).

28   At the onset, it is important to note that this case does not deal with the use of immunized

1    testimony or information derived therefrom as evidence against Rameses at a preliminary hearing

2    or at trial.    Instead, Rameses argues that "immunized testimony and information contributed

3    substantially to the prosecution's decision to pursue this as a three-strikes case, provided

4    investigatory leads in finding additional recipients of Mr. Rameses' checks, and significantly affected

5    the prosecutor's strategy in opposing the motion to strike."[24/]    P&As at 25.    Rameses is clearly

6    asserting that *Kastigar* precludes a *nonevidentiary* use of compelled testimony.

7            *Kastigar*, however, did not address the question as to what extent the Fifth Amendment's

8    privilege against self-incrimination bars the use of *nonevidentiary* use of immunized testimony.

9    *Montoya*, 45 F.3d at 1295; *United States v. Serrano*, 870 F.2d 1, 16 (1st Cir. 1989).    And the circuit

10   courts have disagreed on the issue.    *Serrano*, 870 at 16 (comparing cases such as *United States v.*

11   *McDaniel*, 482 F.2d 305 (8th Cir. 1973) [requiring government to show no nonevidentiary use of

12   immunized testimony] with *United States v. Mariani*, 851 F.3d 595 (2d Cir. 1988), *United States v.*

13

14   _____

15       24.  Rameses' present argument differs from those he raised in the state court in that he
     asserts for the first time that his immunized testimony and information therefrom affected the
16   prosecutor's strategy in opposing his motion to strike.  Compare *id.* with Lodged Item 7 at 2, Lodged
     Item 10 at 4-13 and Lodged Item 14 at 5-10.  Accordingly, it does not appear that this particular
17   argument has been exhausted–i.e., fairly presented to the state court.  *Duncan v. Henry,* 513 U.S.
     364, 365 (1995) ("mere similarity of claims is insufficient to exhaust"); *see also Lyons v. Crawford,*
18   232 F.3d 666, 667-669 (9th Cir. 2000), *amended* 247 F.3d 904 (9th Cir. 2001); *Shumway v. Payne,*
     223 F.3d 982, 998 (9th Cir. 2000); *Keating v. Hood*, 133 F.3d 1240, 1241-42 (9th Cir. 1998);
19   *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996).  As recently noted by the Ninth Circuit,
     "[c]ourts generally do not decide issues not raised by the parties."  *Galvan v. Alaska Department of*
20   *Corrections*, 397 F.3d 1198, 1204 (9th Cir. 2005).

21       Given that Rameses has had numerous opportunities to raise this argument to the state court,
     the latest of which was a supplement to a habeas petition to the California Supreme Court in August
22   2005, Rameses should not be allowed to slip in any new arguments.  "[T]he Federal Rules of Civil
     Procedure, applicable as a general matter to habeas cases, vest the federal courts with due flexibility
23   to prevent vexatious litigation."  *Slack v. McDaniel*, 529 U.S. 473, 489 (2000).  Because Rameses
     has essentially already had a second "bite of the apple" in state collateral proceedings by way of a
24   very recent supplement to his state habeas petition, Respondent submits that the proper remedy is
     to strike any unexhausted claims.
25
         Further, there is no factual development for the claim.  Rameses provides no discussion of the
26   prosecution's strategy for opposing Rameses' motion to strike, or how any information derived
     from Rameses' immunized testimony affected that strategy.  While the state prosecutor admitted
27   error in using information from Rameses' immunized testimony in opposing that motion, "the trial
     court refused to consider that evidence."  Lodged Item 7 at 9.
28

Answer to Petition for Writ of Habeas Corpus

1    *Crowson*, 828 F.2d 1427, and *United States v. Byrd*, 765 F.3d 1524 [all rejecting claim that

2    nonevidentiary use warranted dismissal of indictment]).  The Ninth Circuit has not specifically ruled

3    on the issue.  *Montoya*, 45 F.3d at 1296.

4           Without mentioning the disagreement among the circuits, Rameses simply relies on the

5    Eight Circuit *McDaniel* case to argue that the state's denial of his claim is an unreasonable

6    application of law as established under *Kastigar*.  P&As at 25-26.  The very language he cites to in

7    *McDaniel* precluding the various nonevidentiary uses of immunized testimony (P&As at 26) has

8    been criticized as including substantial dicta.  *Byrd*, 765 F.2d at 1530.  In addition, at least four

9    circuits have rejected the reasoning of *McDaniel*.  *United States v. Daniels*, 281 F.3d 168, 181

10   (2002),[25/] (citing *United States v. Velasco*, 953 F.2d at 1474; *Serrano*, 870 F.2d at 17; *Mariani*, 851

11   F.2d at 600; and *Byrd*, 765 F.2d at 1531).

12          In other words, there is no clearly established federal law that precludes the nonevidentiary

13   use of immunized testimony.  And the state appellate court clear recognized this fact.  Lodged Item

14   at 3.  Thus, the state court's rejection of Rameses' Fifth Amendment claim cannot be said to be an

15   unreasonable application of clearly established United States Supreme Court precedent.  For that

16   reason alone, Rameses is not entitled to any relief on this claim.

17          In addition, the state appellate court provided another reason for rejecting Rameses' claim.

18   That court determined that assuming nonevidentiary use of immunized testimony was prohibited,

19   the record supports the trial court's finding that the government had proved by a preponderance that

20   its prosecutorial decisions were derived from independent sources.  Lodged Item 7 at 3-4, 10-11.

21          The trial court pointed out that the various witnesses that came forward about Rameses'

22   bad checks did so based on information and motivation wholly independent from the news coverage

23   regarding Rameses' past convictions.  VI RT 1496-98.  The trial court also found that the police (i.e.,

24   Frisby and Campagna) were not swayed by immunized testimony, and that there was a wholly

25   independent source or justification for their actions–i.e., that they acting on the basis of the four

26   ───────────────────────────────────────────────────────

27          25.  *Daniels* notes that even the Eighth Circuit has backed away from *McDaniel*, limiting it
     to its "unusual circumstances."  *Daniels*, at 182,  citing *United States v. McGuire*, 45 F.3d 1177,
28   1183 (8th Cir. 1995).

1   murder convictions, the pending New Jersey murder warrant, and the increasing number of bad

2   checks being reported. IV RT 1501-02. As to the prosecutor's actions, trial court found that the

3   prosecutor's decision to charged this as a Three-Strikes case was motivated by the four murder

4   convictions, and the number of bad checks in this case and thus wholly independent of information

5   from immunized testimony. IV RT 1502-03. And even though the prosecutor erred in his argument

6   at the bail hearing, the trial court found no prejudice because there was wholly independent

7   information that warranted increased bail. IV RT 1503-04.

8           Rameses argues that the factual findings of the state court are not entitled to a presumption

9   of correctness under AEDPA because the state *appellate* court had applied the wrong legal standard

10  in making findings of fact. P&As at 26 n.9 (citing *Caliendo v. Warden*, 365 F.3d 691, 698 (9th Cir.

11  2004) [trial court finding not entitled to deference where it placed the burden of proof on the

12  defendant instead of the government]). That argument fails for a number of reasons. First, the

13  requisite findings of fact were made by the *trial* court, and there is nothing to show that the *trial*

14  court applied an incorrect legal standard. Second, contrary to Rameses' suggestion, the appellate

15  court did not "infer findings" favorable to the prosecution. The appellate court merely pointed out

16  that in determining whether sufficient evidence supports a trial court's factual finding, the reviewing

17  court must accept "all inferences which might reasonably have been thought by the trial court" in

18  reaching expressed findings. Lodged Item 7 at 4-5; *cf. Montoya*, 45 F.3d at 1291 (district court's

19  finding that government's evidence was untainted by immunized testimony reviewed under a clearly

20  erroneous standard). Here, the trial court made explicit findings of fact, which is supported by the

21  record. Compare *United States v. Rinaldi*, 808 F.3d 1579, 1583 (D.C. Cir. 1987) (where court noted

22  an absence of specific factual findings as to the source of the government's proffered evidence);

23  *United States v. Hampton*, 775 F.3d 1479, 1485-86 (11th Cir. 1985) (record does not support court's

24  finding that unimmunized statements constitute legitimate independent sources for all information

25  contained in subsequent immunized testimony)).

26          The state court's factual finding that the prosecutorial decisions were based on information

27  from an independent legitimate source is presumed to be correct, and Rameses has the burden of

28  proving otherwise by clear and convincing evidence. *Juan H.* 408 F.3d at 1270 (citing 28 U.S.C.

1 § 2254(e)(1) and *Wiggins v. Smith*, 539 U.S. at 528).  This, he does not, and cannot do.

2                              **CONCLUSION**

3              For the reasons discussed, Respondent respectfully asks that this Court reject each of

4 Petitioner's claims and deny his Amended Petition for Writ of Habeas Corpus.

5

6              Dated:  January 26, 2006

7                                      Respectfully submitted,

8                                      BILL LOCKYER
                                       Attorney General of the State of California

9                                      ROBERT R. ANDERSON
                                       Chief Assistant Attorney General

10                                     MARY JO GRAVES
                                       Senior Assistant Attorney General

11                                     CARLOS A. MARTINEZ
                                       Supervising Deputy Attorney General

12

13

14                                       /s/ Mathew Chan
                                       _____
                                       MATHEW CHAN

15                                     Deputy Attorney General

16                                     Attorneys for Respondents

17  drb
    SA2004FH0198
18  30080042.wpd

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT 1

## DECLARATION OF DEAN IRWIN

I, Dean Irwin, hereby declare under penalty of perjury as follows:

1.     I was the court bailiff responsible for security for the South Lake Tahoe courtroom in which Mr. Robert Rameses appeared for trial before Judge Eddie Keller.

2.     The stun belt that Mr. Rameses wore for his court appearances was worn underneath his clothing.  Bailiff Mike Koring, had one of the remote controls for the belt and is an instructor on the use of the belt.  I may have had possession of a remote control to the belt on occasion.

3.     Mr. Rameses was not told that if he spoke at trial, even to his attorney, that he would be shocked.

4.     To my knowledge, there was never an incident in which Mr. Rameses asked a bailiff with a remote control if he could speak with his attorney and then told by the bailiff to "sit down and shut up."  None of the bailiffs would tell a prisoner to "sit down and shut up" if they wanted to speak with their attorney.

5.     Mr. Rameses was sitting right next to his attorney, Lori London, during the trial.  Mrs. London is outspoken and certainly would have informed the judge if the stun belt was hindering her client's communication with her.

6.     The stun belt was never activated while worn by Mr. Rameses.

I declare under penalty of perjury that the foregoing is true and correct.

Date:

Dean Irwin                                        1- 4-06

# ATTACHMENT 2

## DECLARATION OF MICHAEL KORING

I, Michael Koring, hereby declare under penalty of perjury as follows:

1.      I was one of the court bailiffs responsible for guarding Mr. Robert Rameses when he appeared for trial in the South Lake Tahoe courtroom before Judge Eddie Keller.

2.      The stun belt placed on Mr. Rameses for his court appearances was worn underneath his clothing.  Bailiff Dean Irwin and I had a remote control for the stun belt.  To my knowledge, Mr. Rameses was not told that he would be shocked if he spoke, even to his attorney.

3.      I recall Mr. Rameses being told by one of the other bailiffs that if he tried to stand up, he may be shocked.  However, I never heard of an incident in which Mr. Rameses asked a bailiff with if he could speak with his attorney and the bailiff allegedly telling Rameses to "sit down and shut up."

4.      The stun belt was never activated at trial.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 1/4/06

Michael Koring

# ATTACHMENT 3

## DECLARATION OF LORI G. LONDON

I, Lori G. London, hereby declare under penalty of perjury as follows:

1.      I represented Mr. Robert Rameses in his trial on the charge of issuing checks without sufficient funds in 2000.  I recall the trial because it was a high profile case for El Dorado County.

2.      I recall that prior to the start of trial, there was a discussion between the court bailiff and the trial judge regarding courtroom security.  The judge consented to allowing a stun belt to be placed on Mr. Rameses for trial because Rameses was a large man, had a criminal history, and would be a flight risk.

3.      Mr. Rameses was always very well dressed for his court appearances.  To my knowledge, no member of the jury was aware that Mr. Rameses wore a stun belt at trial.

4.      I recall that Mr. Rameses stated that he did not like having to wear the stun belt, but he never indicated that any threat had been made by the bailiffs regarding the use of the stun belt.

5.      Mr. Rameses never indicated that his ability to communicate with me at trial was hampered by his fear that he would be shocked with the stun belt if he did so.

6.      Mr. Rameses never indicated that his ability to participate in his own defense (whether to testify or otherwise) was influenced by having to wear a stun belt.

7.      Mr. Rameses often participated in courtroom laughter.  I do not believe that Mr. Rameses was impeded in any way by the stun belt.  Had Mr. Rameses indicated that the stun belt was creating a problem, I would not have hesitated to bring up the stun belt issue to the trial judge.

I declare under penalty of perjury that the foregoing is true and correct.

Date:   January 6, 2006

Lori G. London