1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10    ROBERT RAMESES,

11              Petitioner,              No. CIV S-04-1173 GEB GGH P

12        vs.

13    SCOTT KERNAN, Warden,              ORDER and

14              Respondent.              FINDINGS & RECOMMENDATIONS

15    _____/

16    *Introduction and Summary*

17              Petitioner was charged with and convicted of one count (containing numerous

18    occasions) of passing checks with knowledge of insufficient funds to back them up.  However,

19    this was not a garden variety bad checks case.  Petitioner herein, Robert Rameses, was the former

20    Robert Rozier, a professional football player.  As Rozier, he had pled guilty to four murders in

21    Florida.  However, because of petitioner's willingness to testify against a cult leader for whom,

22    or in connection with, he had performed the murders, petitioner received a plea bargain of a total

23    sentence of 22 years, and actually served less than 10.  When El Dorado County prosecutors

24    acquired this information, either historical or by virtue of receiving immunized testimony

25    transcripts (an issue herein), the bad checks case was filed as a Three Strikes case.  After lengthy

26    pretrial proceedings, petitioner went to trial before a jury, was found guilty of passing bad

1

1   checks, and the jury separately found that petitioner had previously been convicted of four

2   murders.  He was sentenced to 25 years to life pursuant to the Three Strikes law.

3           Petitioner raises three issues, all of which involve colorable claims.  First, without

4   a hearing, and without consideration of less restrictive means by which to ensure the security of

5   the courtroom, the court ordered petitioner to wear a stun belt.  Petitioner argues that he was

6   prejudiced thereby.  Secondly, petitioner argues that the prosecutors were motivated to pursue

7   this case as a Three Strikes case by relying, at least in part, on immunized testimony.  Thirdly,

8   petitioner alleges that the failure to submit the definitional  "serious felony" aspect of his prior

9   convictions to the jury, caused an Apprendi violation.

10          For the reasons expressed herein, no evidentiary hearing is ordered for the stun

11   belt issue, and the undersigned recommends that the claim be denied on account of a lack of

12   prejudice to petitioner occasioned by his wearing of the stun belt.  The stun belt claim should be

13   denied.  The undersigned further does not find that non-evidentiary use of immunized testimony

14   states a federal claim as established by Supreme Court authority.  Finally, the court finds that

15   petitioner's sentence was imposed in violation of Apprendi, but finds beyond a reasonable doubt

16   that petitioner was not prejudiced thereby.

17   *AEDPA Standards*

18          The AEDPA (Antiterrorism and Effective Death Penalty Act) "worked

19   substantial changes to the law of habeas corpus," establishing more deferential standards of

20   review to be used by a federal habeas court in assessing a state court's adjudication of a criminal

21   defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir.

22   1997).

23          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

24   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

25   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

26   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

1  "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

2  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

3  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

4  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

5          "Unreasonable application" of established law, on the other hand, applies to

6  mixed questions of law and fact, that is, the application of law to fact where there are no factually

7  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

8  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

9  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

10  deference is not blindly automatic, "the most important point is that an *unreasonable* application

11  of federal law is different from an incorrect application of law....[A] federal habeas court may not

12  issue the writ simply because that court concludes in its independent judgment that the relevant

13  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

14  that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

15  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

16  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

17  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

18          The state courts need not have cited to federal authority, or even have indicated

19  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

20  Ct. 362  (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

21  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

22  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

23  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76 , 123 S. Ct. 1166, 1175 (2003).  Moreover,

24  the established Supreme Court authority reviewed must be a pronouncement on constitutional

25  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

26  binding only on federal courts.  Early v. Packer, 537 U.S. at 10, 123 S. Ct. at 366.

1    However, where the state courts have not addressed the constitutional issue in

2 dispute in any reasoned opinion, the federal court will independently review the record in

3 adjudication of that issue.  "Independent review of the record is not de novo review of the

4 constitutional issue, but rather, the only method by which we can determine whether a silent state

5 court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

6 2003).

7 *Discussion*

8    No detailed factual summary need be given here as the issues have their own

9 discrete set of facts.  The necessary factual discussion will be held in each section.

10    A.  Use of the Stun Belt

11    The undersigned agrees with petitioner that under Gonzalez v. Pliler, 341 F.3d

12 897 (9th Cir. 2003), petitioner did not receive the restraints hearing to which he was entitled.

13 The "hearing" he did receive was nothing more than a short explanation by the judge of a

14 predetermined restraints (stun belt) order which he had already given the court bailiffs.  The issue

15 then becomes one of prejudice which itself is broken into two major areas: (a) the alleged

16 possible prejudice from a juror's seeing the stun belt; (b) the alleged prejudice that the stun belt

17 had on petitioner's ability to focus at trial and communicate with his counsel.

18    Normally, this type of alleged prejudice would require an evidentiary hearing.

19 However, in this case, after expansion of the record to take into account the filed declarations,

20 and based on those declarations as well as the trial record, the court finds: (a) AEDPA precludes

21 a hearing on the possible juror sighting issue; and (b) that allegations of

22 hindrance/communication prejudice are so far fetched as to not require an evidentiary hearing.

23    1.  *Facts and Some Observations*

24    a.  Contemporaneous Facts

25    The trial judge, to whom petitioner's case had been reassigned just before trial,

26 had determined that petitioner was to wear a stun belt during his trial proceedings.  Petitioner

was informed of the judge's order before jury selection was to commence.  The judge did not hold a hearing, but simply announced his decision.The trial judge ordered a stun belt to be used with petitioner at the start of trial despite his "[being] a gentleman thus far throughout our proceedings,'" RT 2986,  because of petitioner's prior criminal history, his size, and the potential sentencing consequences for petitioner if he lost at trial.  Id.

The trial judge was concerned that the jury not see the stun belt:

> My concern was that it not show to the jury because I don't want to prejudice you in the eyes of the jury.  Does your suit coat button so that the whole thing is covered up?  Could you stand so I could see whether it shows at all.

RT 2986-87.

Petitioner replied that "It's not going to button comfortably with that [stun gun belt]."  RT 2987. However, the trial judge was convinced that nothing would show:  "Oh, I see.  I don't think that it will show anything to the jury."  Id.

Importantly, the trial judge then advised petitioner:

> So now it's your obligation, Mr. Rameses, to speak through Ms. London.  *If there's anything you want me to know, anything you want the jury to know, be sure and communicate to her.*  She is your life-line here.  She is your one chance to walk out these doors.
>
> I want to impress upon you, it's vital that you cooperate 100 percent fully with her.  *Give her any information, any thoughts that you have throughout this case.*  And she's a very competent attorney.  She will do a good job for you.  But it takes your cooperation, *your input, and your participation*.  So keep that foremost in your mind.  Okay?

RT 2987-88. (Emphasis added).

Petitioner responded, not with a statement that he had been advised by the deputies that he would be electrically shocked if he spoke with his attorney, or that he couldn't think with the stun belt on, but rather: "Yes, sir."  Petitioner added, *on his own*, the rather astute objection: "I was advised that even though it is a court order for this restraint, that I would need at least to object [citing case law].  Just so that it's on the record."  RT 2988.  The trial judge

5

responded that an "orderly and safe proceeding" was "paramount" in his mind.  Petitioner again

responded astutely: "Yes, sir.  Even though it speaks – evidentiary hearing must be held once the

objection is made.  You're overruling that?"  RT 2989.  The trial judge affirmed the overruling.

Petitioner then went on himself to argue another point about his counsel.

The next morning, according to the Clerks Record, CT 486, the trial judge *sua*

*sponte* reiterated why he was ordering the stun belt to remain on petitioner.  He stated:

> In regard to the other issues Mr. Rameses raised yesterday about
> whether we should have the electronic belt on him, I want to
> amplify on the reasons why I authorized that.  And in addition to
> the reasons I gave you yesterday, Mr. Rameses, and the reasons
> why an evidentiary hearing wouldn't be required under Estelle v.
> Williams and those other cases, the facts I recited, your four prior
> murder convictions, the facts that this is a three-strikes case where
> you're facing a potential severe sentence are undisputed facts.  So
> there's nothing to contest there.  There's no reason for evidentiary
> hearing.
>
> And you're a very large, strong man.  You used to play
> professional football.  That's undisputed.  You even played for our
> alma mater, the Cal Bears.
>
> And it was also reported to me by court staff that you were very
> irritated and upset, agitated by Judge Kingsbury's rulings on the
> counsel issues last week.  So that concerned me about your
> potential of acting out.  And those, again, are undisputed facts in
> terms of perceptions of the court staff that you appeared very
> agitated and upset by her ruling.  So I have to act in the interest of
> safety of everyone: You, court personnel, attorneys, staff, everyone.
> So those are the reasons why I authorized this electronic belt.
>
> And I'm sure– you know– you have conducted yourself as a
> gentleman before me, but I have to, you know, act out of an
> abundance of caution on some issues.  And that's why I did it.

RT (augmented) 88.

The judge then went on to other items of discussion.

That same day, in the afternoon (after jury selection), petitioner's counsel

indicated that she had in fact communicated with her client regarding acquiring transcripts for a

possible writ or appeal (not having to do with the stun belt).  RT 3001.  Petitioner himself

addressed the court on this issue without exhibiting any loss of focus or indicated discomfort.

1   RT 3001-3004.  Nor did he raise any issue with respect to the stun belt.  Later, petitioner

2   communicated to the court that he was satisfied with the witnesses called on his behalf, and that

3   he had decided not to testify.  RT 3355.

4          Excluding jury selection and deliberations, the trial on the bad checks lasted only

5   approximately two and one-half court days.  While the jury was deliberating on the bad check

6   charges, preliminary evidence was taken in court regarding petitioner's prior convictions.  If the

7   verdict was guilty on the bad check charges, the jury was to find whether in fact petitioner had

8   suffered prior convictions.  The jury found petitioner guilty, and short evidence/argument was put

9   before the jury.  In informing the court that she had no argument, petitioner's counsel stated:

10         Because I don't have any argument.  I want–so– because I don't
           really have any argument, and I need to know if Robert [petitioner]
11         feels there's something I need to be presenting on his behalf .

12  RT 3444.

13  The court told her to ask for a break if she needed one.  It did not appear from this short exchange

14  that petitioner's counsel felt that there was any impediment to her consultation with her client.

15  When questioned on a logistical matter just after the jury had found the prior convictions,

16  petitioner did not raise any issue about the impediments of a stun belt.  RT 3453.  The court

17  invited petitioner to talk with his counsel on a particular matter.  RT 3457.

18         Further post-trial hearings were held even before a motion for new trial was made.

19  At this time petitioner was representing himself and was free to communicate with the court.

20  Many issues were raised.  Not once did petitioner complain about having to have worn the stun

21  belt during trial.  Petitioner filed his own motion for new trial and made a myriad of complaints

22  in his Points and Authorities about the trial and especially his counsel.  He did not raise the issue

23  about a stun belt or that it caused any impediments at trial in any fashion.  CT 582 et seq.  He did

24  raise an issue that his counsel would not talk with him during trial, CT 586, nor that he could not

25  talk with his counsel.  Apparently, he was trying to so communicate despite any later asserted

26  impediment in so doing.   At sentencing, the issue of the stun belt was not raised.

b. Appellate and Habeas Facts

Petitioner did not raise the issue of the stun belt in his appeal or initial habeas petitions with the Court of Appeal.  The first time the stun belt issue was raised occurred in the state supreme court petition filed on September 24, 2004 – sometime after his habeas petition had been filed in this court on June 21, 2004.  That state petition references a declaration, but the records supplied to this court do not contain such a declaration.  The first declaration referencing prejudice from having worn the stun belt appeared in this federal case on November 21, 2005 (declaration executed October 3, 2005), but the federal declaration tracks the allegations in the September 2004 state petition.

In this declaration, petitioner declares that pursuant to a form, he was told by the bailiffs each day that he wore the stun belt "that the harness they had put on me was a stun belt and that if he pressed the button on his belt, that a 50,000 volt shock would be produced.  He told me, 'If you move, I will shock you.  If you speak, I will shock you.  If there are any sudden moves, I will shock you.  If you fail to respond to any verbal orders I give you, I will shock you.'"  Petitioner referenced one incident in which he asked a bailiff if he could speak with his attorney, and was told: "'Sit down and shut up.'"  Petitioner asserts that he became intimidated into not communicating with his attorney and was hampered with focusing on the trial because of the fear of shock.[1]

Respondent attached to the Answer declarations from two of the bailiffs present at petitioner's trial.  Both disclaimed any verbal warnings to "sit down and shut up."  The bailiffs also disclaimed knowledge that petitioner was ever advised that if he spoke, he would be shocked, but one recalled advice that if petitioner stood up, "he may be shocked."  Declaration of Michael Koring.  Respondent also supplied the declaration of his trial attorney, Lori London,

---

[1] As respondent notes, petitioner's allegations are somewhat inconsistent in that he avers he was paying close attention to the testimony such that he desired to pass information on about the testimony to his attorney.

who stated:

> 3. Mr. Rameses was always very well dressed for his court appearances.  To my knowledge, no member of the jury was aware that Mr. Rameses wore a stun belt at trial.
>
> 4. I recall that Mr. Rameses stated that he did not like having to wear the stun belt, but he never indicated that any threat had been made by the bailiffs regarding the use of the stun belt.
>
> 5.  Mr Rameses never indicated that his ability to communicate with me at trial was hampered by his fear that he would be shocked with the stun belt if he did so.
>
> 6. Mr. Rameses never indicated that his ability to participate in his own defense (whether to testify or otherwise) was influenced by having to wear a stun belt.
>
> 7. Mr. Rameses often participated in courtroom laughter.  I do not believe that Mr. Rameses was impeded in any way by the stun belt. Had Mr. Rameses indicated that the stun belt was creating a problem, I would not have hesitated to bring up the stun belt issue to the trial judge.

There was not a statement about Rameses actually communicating with his counsel during the time he wore the stun belt, leaving the court with the uncertainty whether no such contact occurred, or to the contrary, that such communication actually did take place despite any felt intimidation.

On November 5, 2007, the undersigned ordered the parties to meet and confer in order to obtain a copy of the form referenced by petitioner ostensibly containing the advisements about use of the stun belt orally read by the bailiffs to petitioner.  Because petitioner refused to sign the form when read, *the* form read to petitioner is not in existence in petitioner's law enforcement "jacket."  However, a generic copy of the form in use at the time of petitioner's trial was located and authenticated.  This form did not include the advisements which petitioner referenced insofar as the form does not indicate that "if you speak" you will be shocked.  The form does not advise that conferring with an attorney will result in triggering the stun.  It does indicate that "outbursts," "hostile movements," tampering with the belt device, failure to follow commands for the movement of one's person, a loss of vision of one's hands by the custodial

officer, and "overt actions" against a person within a fifty foot vicinity could cause the device to be triggered.  Filing of Nov. 16, 2007, Exhibit 1 to Altmeyer Declaration.  Exhibit 3 to the Altmeyer declaration, the form utilized now, specifically provides that conferring with one's attorney will not result in stunning.

C. *Analysis*

Gonzalez v. Pliler, 341 F.3d 897 (9th Cir. 2003) found in an AEDPA habeas case that the use of stun belts equated with the use of physical restraints, i.e., shackles.  Id. at 901.  "And for these reasons, before a court may order the use of physical restraints on a defendant at trial, 'the court must be persuaded by compelling circumstances that some measure [is] needed to maintain the security of the courtroom,' and, as noted, 'the court must pursue less restrictive alternatives before imposing physical restraints."

In fairness to the trial judge, both from a federal perspective, the use of a stun belt at the time of petitioner's trial could reasonably have been viewed as a less restrictive measure than full scale shackling.  All of the cases relied upon in Gonzalez for the purpose of equating the use standards of shackles with a stun belt were issued after the trial in this case.  United States v. Durham, 287 F.3d 1297, 1305 (11th Cir. 2002); People v.Mar, 28 Cal. 4th 1201, 124 Cal. Rptr. 2d 161 (2002).  Indeed, California law at the time of trial herein had expressly determined that shackles and stun belts were different types of restraints not subject to the same standards.  People v. Garcia, 56 Cal. App. 4th 1351, 1356, 66 Cal. Rptr. 2d 350, 354 (1997).

Respondent argues that the equating of stun belts with shackles is not clearly established Supreme Court law citing Diaz v. Secretary for the Dept. of Corrections, 402 F.3d 1136, 1146 (11th Cir. 2005).  If this were the only case on the issue, the undersigned would be persuaded.  This is especially so since California law at the time of petitioner's trial would have indicated to the trial judge that he was acting appropriately.  However, Gonzalez determined that the Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060 (1989) pre-AEDPA "new rule" preclusion did not apply because equating stun belts with other types of physical restraints was "dictated by

10

1   [Supreme Court] precedent." <u>Gonzalez</u>, 341 F.3d at 904-905.  The Ninth Circuit has held that

2   the AEDPA requirement to use only clearly established Supreme Court law in finding a

3   constitutional violation is the codification of <u>Teague</u>.  <u>Allen v. Ornoski</u>, 435 F.3d 946, 955 (9th

4   Cir. 2006).  The undersigned is bound by <u>Gonzalez</u>.

5               Since <u>Gonzalez</u> states the law to be followed, the court has little difficulty in

6   finding that compelling circumstances for use of the stun belt were not present, but in any event,

7   less restrictive measures other than the stun belt were not considered.  There is no "big man" rule

8   regarding the automatic use of physical restraints.  Moreover, as petitioner argues, a prior

9   criminal record, while a factor in the decision to use physical restraints, is insufficient in itself to

10   be compelling.  The potentially lengthy sentence, a Three Strikes sentence, is a rather

11   commonplace sentence in California courts and should not dictate the use of physical restraints.

12   Of course, one looks at all the circumstances in combination; however, the trial court had only

13   good cause for use of a stun belt, not a compelling cause.

14               The item that cements the above finding is actually the reason given by the trial

15   court on the day after the stun belt order.  The trial court referenced that petitioner had become

16   "agitated" on one occasion at one of the pre-trial judge's rulings, and that the trial judge had

17   heard about this from court personnel in the pre-trial judge's chambers.  The level of agitation

18   was evidently not worth commenting about; in any event, there is no record that petitioner had to

19   be restrained at the time he became upset at the judge's ruling.  More importantly, even though

20   pre-trial proceedings in petitioner's case were lengthy and numerous, the record is bare of any

21   reference whatsoever of petitioner causing security problems.  That petitioner, who had been in

22   lengthy pre-trial detention, did not maintain a passive or blase` attitude on one occasion, and

23   became upset at a ruling (something that all lawyers have probably done at one time or another)

24   is hardly a reason to order a stun belt or physical restraints at trial.  The record does not support a

25   finding of compelling reasons to use restraints at trial.

26   \\\\\

1    Finally, there was no recorded discussion whatsoever of alternatives to use of the

2  stun belt.  A predetermined decision was announced; that was that.  The issue becomes one of

3  prejudice and whether petitioner is entitled to an evidentiary hearing to prove that prejudice.  In

4  the alternative, respondent can and does argue that the record refutes any notion of prejudice.

5  *Evidentiary Hearing Standards*

6    Gonzalez v. Pliler held that an AEDPA petitioner only need meet two

7  requirements to obtain an evidentiary hearing: (1) allege facts, which if proven, would entitle the

8  petitioner to relief, and (2) show that he did not receive a full and fair hearing in a state court,

9  either at the time of trial or in a collateral proceeding.  Id, 341 F.3d at 903.  The undersigned is

10  unsure of why Gonzalez did not speak of the other AEDPA requirements for an evidentiary

11  hearing, or the exceptions to the general rule, but it is clear from the Supreme Court and other

12  Ninth Circuit cases that other requirements/exceptions do exist.

13    The threshold requirement is that the petitioner act diligently in his pursuit of

14  having the evidentiary hearing in state court, i.e., "not failed [through the petitioner's own lack of

15  diligence] to develop the factual basis of the claim in state courts."  Insyxiengmay v. Morgan,

16  403 F.3d 657, 670 (9th Cir. 2005).

17    Moreover, the court does not have to hold an evidentiary hearing when the record

18  clearly refutes the collateral factual allegations raised by petitioner.  Schiro v. Landrigan,

19  __U.S.__, 127 S. Ct. 1933, 1940 (2007); similarly, palpably incredible or patently frivolous

20  claims need not garner an evidentiary hearing just because the petition "says so."  United States

21  v. Leonti, 326 F.3d 1111, 1116 (9th Cir. 2003).  In addition, the court retains some discretion to

22  utilize expansion of the record in lieu of a full fledged trial type hearing.  Where the district court

23  concludes that "[a full evidentiary] hearing would not offer any reasonable chance of altering [the

24  court's] view of the facts," as presented by the record and any expansions thereto, a trial type

25  hearing will not be necessary.  Williams v. Woodford, 384 F.3d 567, 591 (9th Cir. 2004).  In

26  utilizing this discretion, the undersigned understands that matters of credibility are not often

1    determined on the basis of the record.

2    *Discussion*

3          Respondent focuses exclusively on post-trial filings to arrive at a determination

4    that petitioner did not act diligently in requesting an evidentiary hearing even though he in fact

5    requested one in state court habeas proceedings.  However, the trial record demonstrates that

6    petitioner could not have initially acted more diligently than he did when petitioner *personally*

7    raised an objection at trial that he was not receiving an evidentiary hearing on the stun belt issues.

8    The fact that the trial court cut him off, and missed some of the potential reasoning for having

9    that hearing, i.e.,  was it intimidating to petitioner, and so forth, cannot be held against petitioner.

10   (The failure of petitioner to raise the stun belt issue thereafter until 2004, despite many prior

11   opportunities to do so, adversely affects petitioner's credibility, see below.)

12         The non-exhaustion argument fares better for respondent with respect to the issue

13   of whether the jury could see the stun belt.  Petitioner never asserted in state court that he

14   believed the jurors could see the belt – his sole ground of complaint concerned the alleged

15   intimidation caused by the stun belt and focus interrupting nature of the stun belt.  Respondent is

16   correct that petitioner cannot simply raise as an afterthought in federal court a completely

17   different factual basis for the stun belt claim, and a fairly dispositive one, than that which was

18   raised in the state direct review or collateral proceedings.  Aiken v. Spaulding, 841 F.2d 881,

19   883-84 (9th Cir. 1988).  See also Picard v. Connor, 404 U.S. 270, 92 S. Ct. 509 (1971) (both

20   operative facts and legal claim must have been presented to the state courts).[2]  Therefore,

21   petitioner may not have an evidentiary hearing on the issue of whether the jury saw the stun belt.[3]

22

23         [2]  Thus, the issues of entitlement to an evidentiary hearing and exhaustion are not
     completely overlapping.  While one can speculate to a degree what claims may have been raised
24   had a requested evidentiary hearing been held in the trial court, petitioner still maintained the
     obligation to expressly explicate his claim on state collateral review.

25         [3]  An evidentiary hearing on the juror issue would be exploratory in any event.  No
     evidence has been produced, in terms of declarations or documents, which would suggest that
26   any juror has been contacted, and that a juror saw the stun belt.  As the Ninth Circuit has held,

13

1    The "intimidation" issue poses a different question.  As previously indicated, the

2  trial court erred in not having an evidentiary hearing on the stun belt issue, including an analysis

3  of lesser means to ensure security which may have been effective.  The closer issue, however, is

4  whether the record clearly refutes petitioner's latter day assertions of prejudice in terms of

5  hindering petitioner's focus at trial or intimidating petitioner into not communicating with his

6  client.  Petitioner has so sworn in his declaration presently before the court.

7    Normally, such a declaration would require the holding of an evidentiary hearing.

8  If it were true that petitioner felt precluded from conferring with his attorney, or that his

9  concentration was significantly affected, the writ should be granted.  However, the record so

10  clearly refutes petitioner's allegations that holding an evidentiary hearing would be wasteful.

11  First, petitioner declared that the custodial officers read from the form – but the form does not

12  contain the rather bizarre "do not speak" advisements to which petitioner testified.  Second,

13  given the entire record in this case, and petitioner's history of being outspoken, it is beyond belief

14  that he would never have mentioned his thoughts regarding the stun belt to his attorney, at some

15  time, in court or otherwise, orally or in writing, that he felt hindered in communication and focus.

16  There are certainly no writings to this effect.  Third, and very important, the judge told petitioner

17  on the record that he *was* to confer with his attorney.  Petitioner himself responded to the judge,

18  but the response did not contain mention of any draconian stun belt procedures which would

19  have precluded such communication – petitioner merely raised a legal objection to use of the stun

20  belt at all.  How "shocked" could petitioner have been at his stun belt procedures if he failed to

21  even reference them when the topic was being aired in court?  Throughout the remainder of the

22  trial, petitioner never raised the issue of his supposed lack of focus or communication even when

23  he was personally speaking.  To the extent that petitioner asserts that he was discouraged from

24  

25  petitioner is not entitled to an evidentiary hearing to "explore [his] case in search of its existence."  Rich v. Calderon, 187 F.3d 1064, 1067 (9th Cir. 1999).  Furthermore, the trial judge himself remarked that the jury would not be able to see petitioner's belt, and that fact is entitled

26  to deference.  See Gonzalez at 341 F.3d at 903.

14

1   testifying because of the wearing of the stun belt, his calm, unequivocal statement to the judge

2   that he was satisfied with the witnesses called on his behalf, and did not desire to testify, RT

3   3355, obliterates the assertion.  After trial, the alleged prejudice was not mentioned at the motion

4   for new trial, the brief for which was written by petitioner himself at a time that he was

5   representing himself, nor was it raised at all on appeal.  Such was not even thought of in the

6   initial habeas petition.  The court can only find that petitioner's recollection of the prejudice from

7   the stun belt advisements that he received was exaggerated in its harshness over the lengthy time

8   between being given advisements and petitioner's decision to finally raise the stun belt issue in

9   his state supreme court habeas petition in 2004.  It may well be that the Ninth Circuit decision in

10  Gonzalez, which had just been issued prior to the filing of that state petition, simply prompted a

11  recitation of facts by petitioner which would equate with prejudice.  Finally, the internal

12  inconsistency of petitioner's allegations, i.e., that his concentration was hampered, but that he

13  nevertheless desired to communicate many times with his counsel about evidence/testimony

14  which had concerned him in court, cements the conclusion that petitioner's prejudice assertions

15  are makeweight.

16      B.  Rameses Cannot Prevail on His Apprendi Claim

17          After his professional football career, petitioner had become a type of enforcer for

18  a cult leader whose cult was located in Florida.  In 1988, petitioner was sentenced to a total of 22

19  years after pleading guilty to four murders in Florida; petitioner was out of prison less than ten

20  years later.  While it might seem odd that four murders would warrant such lenient treatment,

21  petitioner had agreed to help the government  prosecute the cult leader.  Evidently, the

22  government officials needed to prosecute and convict the leader more than they needed to punish

23  petitioner for murder.[4]

24  _____

25      [4]  According to petitioner's present habeas counsel, the Florida prosecutors bought a pig
    in a poke.  Counsel reports that the Florida prosecutor told the deputy district attorney
26  prosecuting this bad check case that "the jury had acquitted Yahweh Ben Yahweh in an hour, that
    Mr. Rameses was not credible, and that he was a dangerous, pathological liar."  See RT 1162-

After being convicted on the bad check charges in El Dorado County in 2001, petitioner was sentenced to 25 years to life.  The bad check charges, which by themselves would have led to approximately one year in prison, were greatly enhanced for sentencing purposes by California's Three Strikes Law.  Petitioner contends that the jury had to find that his murder convictions in Florida were "serious felonies" for purposes of California law, and the failure to give this issue to the jury requires reversal of the sentence.  The undersigned starts with a recitation of the Three Strike law.

> (2)(A) If a defendant has two or more prior felony convictions as defined in subdivision (d) that have been pled and proved, the term for the current felony conviction shall be an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greater of:
>
> (i) Three times the term otherwise provided as punishment for each current felony conviction subsequent to the two or more prior felony convictions.
>
> (ii) Imprisonment in the state prison for 25 years.
>
> (iii) The term determined by the court pursuant to Section 1170 for the underlying conviction, including any enhancement applicable under Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, or any period prescribed by Section 190 or 3046.

Cal. Penal Code 667(e).

Subdivision (d) defined the requisite prior "serious" felonies as:

> (1) Any offense defined in subdivision (c) of Section 667.5 as a violent felony or any offense defined in subdivision (c) of Section 1192.7 as a serious felony in this state...
>
> (2) A conviction in another jurisdiction for an offense that, if committed in California, is punishable by imprisonment in the state prison. A prior conviction of a particular felony shall include a conviction in another jurisdiction for an offense that includes all of the elements of the particular felony as defined in subdivision (c) of Section 667.5 or subdivision (c) of Section 1192.7.

---

1163.

1    In turn, Cal. Penal Code § 1192.7 (c)(8) and (c) (23), defines serious felony in pertinent part as

2    any felony in which the defendant personally used a "firearm" or "dangerous or deadly weapon."

3                    In the trial court, evidence of the indictments, plea agreement and judgments were

4    put before the jury.  (In California, the jury determines the existence of prior convictions).

5    Petitioner presented no contrary evidence to that contained in the documents.  In addition,

6    petitioner's counsel never asked that the matter of whether the previous convictions were

7    "serious felonies" go before the jury; rather she was content with the judge deciding the issue at a

8    later time.  RT 3446.  It so happened that the issue was not raised again in the trial court, and no

9    ruling was ever made.

10                   In state appellate court, petitioner argued, and the Court of Appeal accepted, the

11   argument that the Florida murder felonies did not match all of the elements of a California

12   murder felony.  The precise reasons for this are unimportant.  However, *any* previous felony is a

13   serious felony for purposes of Three Strikes, and regardless of matching elements, if that felony

14   was committed whereby the defendant personally used a firearm or other dangerous or deadly

15   weapon; such is a qualifying felony for the purposes of Three Strikes.  Petitioner does not contest

16   the validity of the state law conclusion.  The Court of Appeal also found that sufficient evidence

17   was in the record such that a finding could be made [on appeal] that the Florida murders

18   qualified as serious felonies.  Petitioner does not contest that finding *per se*.  Appellate counsel

19   raised no Apprendi [v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000)] issue.  The Apprendi

20   issue was not raised until later in habeas corpus.[5]

21                   Petitioner argues here that in order to qualify for "serious" felony, the factual

22   issues of personal use of a firearm or dangerous weapon in connection with the charged prior

23   felony would have to be submitted to the jury (not just the fact of the conviction).  Respondent

24   _____

25        [5] Petitioner was fortunate in that clearly the Apprendi issue could have been procedurally
     barred for failure to object to the asserted error in the trial court and in failure to raise it on direct
26   appeal.  For whatever reason, the state habeas courts did not make their rulings on procedural
     bar.

1    argues that the Apprendi exception, which *in federal law* authorizes proof of the fact of a prior

2    conviction to be decided by the court and need not be submitted to the jury, saves the day, and

3    that definitions concerning the nature of the prior crimes within the prior conviction exception do

4    not require a jury verdict either.

5            The issue is complicated because California law requires prior convictions to be

6    found by a jury, and is further complicated by the very recent Ninth Circuit *en banc* case of

7    Medley v. Runnels, __F.3d__, 2007 WL 3197087 (9th Cir. Nov. 1, 2007) [not available to the

8    parties at the time of briefing].  For the reasons set forth below, the undersigned finds an

9    Apprendi violation, but that it was harmless beyond a reasonable doubt.

10           Respondent's argument might be a good one, and his cited cases applicable, if

11   California law did not require the fact of a prior conviction to go before a jury.  However, it does.

12   The case of Medley is similar in many respects to the case here.  Medley was convicted of

13   murder with the sentencing enhancement of discharging a firearm during the course of a murder.

14   Both matters were submitted to the jury.  However, the judge determined to instruct the jury that

15   a flare gun, the device used to kill the victim, was a firearm under California law – thereby taking

16   that factual matter from the jury.  California law did not expressly so state; there were factual

17   requirements to find that a weapon was a firearm, and the judge had taken it upon himself to

18   make those findings.  Of particular importance here, the Ninth Circuit found substantively

19   identical the asserted Sandstrom [v. Montana, 442 U.S. 510, 99 S. Ct. 2450 (1979)] error with

20   that of the found Apprendi error.  Medley, 2007 WL 3197087 *4.  In either case, the

21   constitutional defect was not presenting all factual issues to the jury.  The writ was granted.

22           Thus, Respondent's argument that the Apprendi "prior conviction"exception

23   places this case in a different posture falls away.  Whether California *would have been required*

24   to submit all factual matters regarding the prior conviction sentencing enhancement to a jury if

25   jury trial were not required by state law is beside the point, the fact is that the jury *is* tasked with

26   such findings.  The issue then becomes, whether considered a Sandstrom or Apprendi issue, was

18

*every* fact determination necessary to find a sentence enhancement in petitioner's case presented to the jury.

Respondent argues (citing cases from jurisdictions where a jury is not required to find the prior conviction) that the definition of "serious" felony is a legal matter, and that the Court of Appeal decided that legal matter.  While that argument had initial appeal to the undersigned, the same type argument was found unavailing in Medley.  Just as in Medley where "firearm" was to be determined by factual characteristics, a felony in petitioner's case was only "serious" when proof of *personal use* of a firearm or knife-like weapon in the previous felony was put before the trier of fact and so found.  As a factual matter, the jury had to determine from the submitted exhibits the factual matters of personal use of a firearm and knife-like object. While that fact is not often difficult to ascertain, there is no Apprendi/Sandstrom  rule that "easy" factual matters can be decided by the judge.

Apprendi errors are not automatically fatal, but are subject to a harmless beyond a reasonable doubt exception.  Washington v. Recuenco, __U.S.__, 126 S. Ct. 2546 (2006).  In this case, that standard is satisfied with at least two of the prior convictions (all that is necessary for the 25-life sentence).  The Court of Appeal determined that sufficient evidence existed in the record to determine the "seriousness" of the prior felonies (admittedly a much different standard than the one to be used here).  However, that court's description demonstrates that the error was harmless beyond a reasonable doubt as well.

> Each of the three relevant indictments [encompassing four murders] charged the admitted murders with some particularity, as follows.  Indictment No. 86-32222 charged (count I) that on October 30, 1986, defendant "as part of a common scheme or plan, while acting as a principal in concert with [another], did unlawfully and feloniously, from a premeditated design to effect the death of a human being, to wit: RUDOLPH BROUSSARD, kill RUDOLPH BROUSSARD, a human being, by shooting him with a firearm , to wit: a pistol."  Count II alleges the same as to victim Anthony Brown.  Indictment No. 87-3750 charged that on September 21, 1986, defendant, acting with premeditation or while committing a burglary "did... kill and murder CECIL BRANCH, a human being, by stabbing, slashing or cutting the said CECIL BRANCH with a

deadly weapon, to wit: a sharp metal object, such as a knife or sword." Indictment No. 87-3751 alleged the same as to victim Raymond Kelley, except the weapon was described simply as a knife." Therefore, the indictments served to provide the factual bases of the crimes admitted by defendant's plea.

The *plea agreement* disposed of other charges and another case... and reduced the first degree murder charges to second degree murder. The *judgments* show defendant was guilty of two second degree murders "with" a firearm and two second-degree murders "with" deadly weapons ("knife or sword" and knife").

Court of Appeal Opinion at 13-14.

Only one with an advocate's stretch could conclude from the record evidence presented to the jury that someone else, i.e, the other person acting in concert, and aside from petitioner, actually used the firearms. But even assuming that stretch, there is no doubt that petitioner, the only person named with respect to the knifings, killed two persons with a "knife or sword" like instrument, and the judgments confirmed those facts. It only takes two prior felonies to trigger the Three Strikes 25-life penalty. Thus, the triggering felonies would have no doubt been found by the jury beyond a reasonable doubt. Moreover, petitioner cannot seriously argue that the sentencing judge in petitioner's case would have been swayed by the fact in determining to strike triggering priors (in his discretion – the Romero motion) that there were only two triggering murder offenses. Surely, the judge's discretion would have also been legitimately guided by the undisputed facts of the other two firearm murders, and anyone reading the sentencing transcript can tell that all the lightly punished murders weighed heavily in the judge's mind to not strike any priors. RT 3552-3554.

Petitioner's Apprendi, aka Sandstrom, claim should be denied.

*The Supreme Court Has Not Extended the Rule of Kastigar to Non-Evidentiary Uses*

There is no need to detail all the facts concerning alleged use of testimony which had been given under a grant of use immunity[6] in the Florida prosecution. Suffice it to say, as the

---

[6] No one contends that petitioner was granted transactional immunity.

1 Court of Appeal did in its lead paragraph on the issue:

> Defendant had committed several murders in Florida at the behest
> of Yahweh Ben Yahweh, whom he described as the "head of a
> black, racist cult, whose members claimed to be the true Jews, and
> who believed their divine mission to be the elimination of the
> white race."  In 1988 he [petitioner] pleaded guilty to four second
> degree murders and agreed to testify under immunity about the cult
> in exchange for dismissal of three murder counts, and a 22-year
> sentence; were he later charged with other Florida homicides he
> would receive concurrent terms.  Breach of his agreement would
> result in consecutive terms.

8 Court of Appeal Opinion at 5.

9      There is no dispute that petitioner's criminal history played a dispositive role in

10 prosecuting the bad check incidents as felonies with the Three Strikes enhancement.  There is

11 also no dispute that the El Dorado County prosecutors obtained transcripts of the immunized

12 testimony.  Disputed is the extent to which that immunized testimony, as opposed to the non-

13 immunized Florida plea bargain and historical facts, influenced the prosecutor's charging

14 discretion and case strategy.  For the purposes of initially analyzing the issue in this habeas

15 petition, the undersigned will assume that knowledge of the immunized testimony played some

16 additive role in these decisions.

17      The California prosecutors had also "used" some of the immunized testimony,

18 not at trial or before a grand jury, but at a bail hearing and in opposition to a motion to strike

19 priors.  The Court of Appeal found in this respect:

> The [trial] court found Sutherland's use of immunized information
> at the bail hearing was harmless "piling on" because defendant had
> four murder convictions and a pending murder warrant from New
> Jersey.  Sutherland's effort to use the information to oppose
> defendant's motion to strike the priors was harmless because the
> trial court had refused to consider that evidence.

24 Court of Appeal Opinion at 9

25      Petitioner does not attack the attempted use of the immunized testimony at the

26 bail hearing and motion to strike priors evidently agreeing with the common sense conclusion

1  reached by the Court of Appeal – that any such use was rejected or harmless.  Petitioner does

2  argue:

> The evidence adduced at the [state court] hearing in this case
> unequivocally demonstrated that immunized testimony and
> information contributed substantially to the prosecution's decision
> to pursue this as a three strike's case, provided investigatory leads
> in finding additional recipients of Mr. Rameses' checks, and
> significantly affected the prosecutor's strategy in opposing the
> motion to strike priors.

7  Points and Authorities at 25.

8  Thus, the issue is clearly drawn – does established Supreme Court authority exist which

9  precludes the non-evidentiary use of immunized testimony.  While the issue may be clearly

10  drawn, the case authority on the issue is in disarray – even within the Ninth Circuit.  Thus, the

11  undersigned cannot find that the Supreme Court has established a prohibition on non-evidentiary

12  use of immunized testimony – an AEDPA prerequisite.

13          In Kastigar v. United States, 406 U.S. 441, 92 S. Ct. 1653 (1972), the Supreme

14  Court clearly held that evidentiary use of testimony compelled under a grant of use and derivative

15  use immunity is constitutionally prohibited.  The Court then turned to the questions "we must

16  consider" concerning the argument that "use and derivative-use immunity will not adequately

17  protect a witness from various possible incriminating uses of the compelled testimony: for

18  example, the prosecutor or other law enforcement officer may obtain leads, names of witnesses,

19  or other information not otherwise available that might result in a prosecution."  Id. at 459, 92 S.

20  Ct. at 1664.  While the "other information" could possibly relate to the motivation for bringing

21  the instant prosecution, the Supreme Court indicated that the "other information" had to be

22  ultimately other information used in an evidentiary sense.  In discussing the burden of proof

23  related to showing an independent source for the use of information otherwise encompassed by

24  the immunized testimony, the Court limited that burden to showing "that the evidence it [the

25  prosecution] *proposes to use* is derived from a legitimate source wholly independent from the

26  compelled testimony."  Id. at 460, 92 S. Ct. at 1665.  It appears to the undersigned that the

Supreme Court is referencing evidentiary usage and not something as intangible as a prosecutor's motivation in bringing a case.

The Ninth Circuit has not made up its mind either way, or perhaps has held inconsistently that <u>Kastigar</u> does and does not apply to non-evidentiary uses.  The first Ninth Circuit case to tackle the issue was <u>United States v. Crowson</u>, 828 F.2d 1427 (9th Cir. 1987).  It is unclear from reading that case whether the Ninth Circuit was holding that non-evidentiary uses of immunized testimony were precluded, or was simply discussing the approach of different circuits and making a ruling simply assuming the more preclusive rule.  But rather than relying on the undersigned's reading, there are authoritative interpretations of the <u>Crowson</u> case, albeit inconsistent:

> Non-evidentiary use of immunized testimony could include the decision to prosecute an immunized witness.  <u>Crowson</u>, 828 F.2d at 1430.  <u>Kastigar</u> did not expressly discuss the propriety of non-evidentiary use.  <u>See</u> <u>Kastigar</u>, 406 U.S. at 453, 460, 92 S.Ct. at 1661, 1664-65.  In <u>Crowson</u>, we assumed that non-evidentiary use was prohibited.  <u>Crowson</u>, 828 F.2d at 1430 ("A more difficult question is what proof or procedures the government must employ to carry its burden of showing that it made no non-evidentiary use of the immunized testimony.").
>
> ***
>
> As pointed out above, this circuit has not specifically decided whether non-evidentiary use comes within the prohibition of the statute. We need not decide that general issue in this case, either, but will assume that some non-evidentiary uses could come within the ban of the statute.

<u>United States v. Montoya</u> 45 F.3d 1286, 1295-1296 (9th Cir. 1995).

However, in <u>United States v. Danielson</u>, 325 F.3d 1054, 1072 (9th Cir. 2003), the statement was made (without citing <u>Montoya</u>):

> In this circuit, we have interpreted <u>Kastigar's</u> prohibition on use to include both direct and indirect use. For example, information derived from compelled testimony may not be used in providing "assistance in focusing the investigation, deciding to initiate the prosecution, refusing to plea bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." <u>United States v. Crowson</u>, 828 F.2d 1427, 1430 (9th Cir.1987) (quoting <u>United States v. McDaniel</u>, 482 F.2d 305, 311 (8th Cir.1973)).

1    The point to be made here is that if two panels of the Ninth Circuit cannot agree

2    whether Kastigar precludes the non-evidentiary use of immunized testimony, much less even

3    agree on an interpretation of a  previous case discussion of the issue in Crowson, it cannot be

4    held that the Supreme Court has clearly established law on the subject – an AEDPA requirement.

5    See also other out-of-circuit cases cited by respondent going both ways on the issue.  Answer at

6    29-30.[7]

7    Given the clear lack of established Supreme Court authority on the issue of

8    whether Kastigar set a rule precluding non-evidentiary use of immunized testimony, and a

9    substantial disagreement within and without the Ninth Circuit on what Kastigar meant to say on

10   the subject, the court need not determine whether the state prosecutors in this case would have

11   been motivated to act as they did purely on the non-immunized historical facts.  Petitioner cannot

12   prevail on the threshold prerequisite of demonstrating that the Supreme Court has established a

13   rule precluding non-evidentiary use of use and derivative use of immunized testimony.

14   *Conclusion*

15   The undersigned ORDERS that no evidentiary hearing be held on the stun belt

16   issue.  The court FINDS and RECOMMENDS that the petition be denied in its entirety.

17   These findings and recommendations are submitted to the United States District

18   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

19   days after being served with these findings and recommendations, any party may file written

20   objections with the court and serve a copy on all parties.  Such a document should be captioned

21   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

22

23        [7] The undersigned is well aware of the authority which uses some circuit court decisions
     as so closely on point with a Supreme Court case or line of cases that the circuit case is in fact
24   finding that the decision in its case was decided by "established" Supreme Court authority, or the
     decision is simply a clarification of such authority.  See Duhaime v. Ducharme, 200 F.3d 597,
25   602-03 (9th Cir. 1000).  However, in light of the conflict in interpreting Kastigar's meaning with
     respect to non-evidentiary uses of immunized testimony, none of the Ninth Circuit cases
26   constitute a "clarification."

1  shall be served and filed within ten days after service of the objections.  The parties are advised

2  that failure to file objections within the specified time may waive the right to appeal the District

3  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

4  DATED: 11/27/07

/s/ Gregory G. Hollows
_____
UNITED STATES MAGISTRATE JUDGE

GGH:gh:035
rame1173.157

25